The opinion of the court was delivered by
Tilghman, C. J.
This is an important cause, and was well argued. The facts appear in a case stated in the nature of a special verdict, and the question is, whether the plaintiff be entitled to recover damages against the defendants, under the provisions of the act of the 8th of March, 1815, by which the defendants were incorporatéd? The defendants, by virtue of powers vested in them by that act, concerning which, there is no dispute, erected a dam across the river Schuylkill, by which the fish were prevented from running up, to the great injury, as the plaintiff alleges, of his fishery, appurtenant to his land, on the eastern bank óf the river, above the ebbing and flowing of the tide. The plaintiff claimed the exclusive right of fishery, opposite to his own land, to the middle of the river, or at least'the exclusive right of drawing a seine on his own land, and even under that restriction, he contends that his property has sustained an injury, for which he is entitled to compensation. In order to decide this question, it will be necessary to consider 1st, what the plain .iff’s right of fishery really was, and 2d, whether his property has sustained such an injury as was intended to be compensated by the act of assembly.
1. The plaintiff contends, that the'rivers of Pennsylvania are subject to the rule of the common law, that is, that all fresh water rivers, (by which is understood, rivers where the tide does, not ebb and flow, and which are therefore said to be not navigable,) belong to the owners of the soil adjacent; so that the owners of one side have, of common right, the property of the soil, and consequently the right of fishing* usque ad filum, medium aquae, and the owners of the other side, the right of soil and fishing, unto the filum aquae of their side ; and if a man is owner of the land on both sides, he is owner of the of the whole river, and hath a right of fishing according to the extent of his land in length. This is the law laid down in Harg. Law Tracts, 5, for which he cites good authority. The right of fishing, in England, is founded *79 originally on the right of soil. The king has a right of property or ownership in the sea, and soil thereof, and in the arms and creeks of the sea; yet a subject may have such right by grant from the king, or by prescription which supposes a grant. (Harg. Law Tracts, 11, 17.) But the common law does not vest the right of soil or fishery, in the owners of land on the margin of navigable ‘ rivers, that is, rivers where the tide ebbs and flows. The great rivers of America are so different from those of England, that in the opinion of many, the same definition of a navigable river cannot properly be applied to both. Many of our rivers, such as the Mississippi, Ohio, Alleghany and Susquehanna, are navigable, even in their natural state by vessels of considerable burden, and whether if such rivers had existed in England', the rule of the common law might not have been different, may, certainly admit of question. As to the extension of that law to the American rivers, the judges of different states have held different opinions. Massachusetts, Connecticut, and New-York, seem to be for the common law, if we are to judge from the cases of The Boston, and Roxbury Mill Corporation v. Gardner and another, 2 Pick. Rep. 33, Adams v. Pease, 2 Conn. Rep. 481, The People v. Platt and others, 17 Johns. 195, and Hooker v. Cummins, 20 Johns. 90. On the contrary, Pennsylvania and South Caro-Una, think the rule of the common law inapplicable to their great rivers, as appears from the cases of Carson v. Blazer, 2 Binn. 475, and Cates v. Wadlington, 1 M'Cord's Rep. 580. Distinctions might be found between the cases decided in Massachusetts, Connecticut, and New York, and that now before us. But I am not disposed to enter minutely into these cases, or to combat the opinions of the learned judges of other states, since much depends on the customs which have prevailed, and the laws which have been enacted in each state. I consider it as settled in Pennsylvania, by the decision in Carson v. Blazer, that the owners of land on the banks of the Susquehanna and other principal rivers, have not án exclusive right to fish in the river immediately in front of their lands, but that the right to fisheries, in these rivers, is vested in the state, and open to all. It is unnecessary to enumerate at this time the rivers which may be called principal, .but that name may bo safely given to the Ohio, Monongahela, Youhiogeny, Alleghany, Susquehanna, and its north and west branches, Juniata, Schuylkill, Lehigh, and Delaware. There is one decisive reason against extending the common law to Pennsylvania, ánd that is, that the right of fishing in England flows from the right of soil. Now, with us, it never has been supposed, from the earliest times to the present moment, that the owners of land on the bank had the right of property in the soil, to the middle of the river in front of their land ; because, if they had, they would have a right to the islands also, contrary to universal opinion and practice. These islands have never been open to appli *80 cants under the common terms of office, éither under the proprietary or state government, but have always been sold on special contract, and for higher prices than common; whereas the lands on the banks of rivers have always been open to the public on the usual terms and at the usual prices. For a particular account of the manner in which islands have been granted, I refer to the case of Hunter v. Howard, 10 Serg. & Rawle, 243. Tt is worthy of observation, also, that the proprietaries of Pennsylvania, and after them the commonwealth, which succeeded to their estate, exercised the right of granting licenses to keep ferries over rivers. Acts of assembly granting these licenses, with respect to the Susquehanna, Monongahela, Youghiogeny, Ohio, Schuylkill, and Juniata, will be found in 2 Sm. L. 81, 89, 232, 243, 269, 412; 3 Sm. L. 270, 258; 4 Sm. L. 359, 484, 516. As for the soil over which our great rivers flow, it has never been granted to any one, either by -William Penn, or his successors, or the state government. Care seems to have been taken, from the beginning, to preserve the waters for public uses, both of fishery and navigation ; and the wisdom of that policy is now more striking than ever, from the great improvements in navigation already made and others in contemplation, to effect which it is often necessary to obstruct the flow of the water in some places, and in others to divert its course. It is true, that the state would have had a right to do these things, for the public benefit, even if' the rivers had been private property; but then compensation must have been made to the owners, the amount of which might have been sp enormous as to have frustrated, or at least checked these noble undertakings. When the case of Carson v. Blazer was first decided, some’persons apprehended scenes of confusion, from throwing open the right of fishery. But, on the contrary, peace and good order, to a degree unknown before, have been the consequences, and the decision has given general satisfaction.
The counsel on both sides have relied on several acts of assembly which have been made, respecting the navigation and fisheries of the Schuylkill. The material parts of these acts I will briefly notice. On the 14th of March, 1761, 1 Sm. L. 235, an act was passed, the object of which was, to render the Schuylkill navigable. For this purpose commissioners were appointed, and vested with extensive powers. They were authorized to erect dams, pens for water locks, or any other works whatever, which they might think most fit and convenient, to answer the purposes of improving the navigation, also to make towing-paths, &c. The same act prohibits the erection, by individuals, of any wears, racks, fishing-dams, pounds, or other devices, by which the fish may be obstructed in their passage up the river, — provided, that this shall not be tonstrued so as to affect the right before given to the commissioners, to erect dams, &c. Considering the whole of this act, it would seem, that the legislature supposed they had *81 a right to injure the fisheries to what extent they pleased, for the purpose of improving the navigation of the river, without making compensation to the owners of lands contiguous to it, because it is evident that the construction of dams and locks was in contemplation, which must necessarily obstruct the passage of fish upwards. By the act of the 9th of March, 1771, 1 Sm. L. 314, it was enacted, that a seine should be drawn only once, in any one pool or fishing place, from twelve o’clock at noon of one day to the same hour of the next day, in order that the inhabitants in the upper part of the Schuylkill, might not be deprived of a reasonable proportion of fish. But every person might fish with a hoop-net. This general permission to fish with hoop-nets, negatives the exclusive right of those persons who owned the lands adjacent to the river. But the acts of the 9th of March, 1786, 2 Sm. L. 370, and the 11th of April, 1793, 3 Sm. L. 115, speak of the proprietors of fisheries, and the owners of fishing places or parts used as fisheries. And by these expressions, it was argued by the counsel for the plaintiff, the right to fisheries was recognized. The right to fisheries certainly was recognized, but it remains to be inquired what was meant by a fishery. And I apprehend that by a fishery, was understood the exclusive right which every owner of land on the margin of the river has, to use his own property for the purpose of drawing a seine, or practising any other device for the catching of fish. This exclusive right gave the proprietors of these lands such great advantages, that it was hardly worth while for any other persons to attempt to fish with seines. The right of property on the front of the river was valuable, therefore ; it was called a fishery, and some spots remarkably favoura-ble might be rented for considerable sums annually. Nevertheless, as the entire right to the soil and water of the river remained vested in the state, for the benefit of the public, the owners of the adjoining lands could not complain that their property was invaded, if, for the purpose of improving the.navigation (of infinitely more importance than fisheries,) such works were erected unuer sanction of law, as obstructed the passage of fish. But as the value of these lands would be lessened by the erection of such works, although the public, in strict justice, might not be bound to make compensation, yet it might perhaps be thought reasonable by the legislature to make it. The act of assembly under which the defendants erected the dam, which prevented the fish from passing up as high as the land of the plaintiff, has directed compensation to be made in certain cases, and whether the plaintiff can bring himself within either of these cases, is, I think, the only question in this cause. Let us examine this act, then, on which every thing depends, after premising, that there is no reason why the court should be inclined to depart from the common meaning of words, in order to introduce what is sometimes called a liberal construction in favour of one party or the other. The plaintiff may think *82 it hard if his laqd should be deteriorated in value, without receiving compensation; and the defendants would surely have cause to complain of hardship, if after engaging in an enterprize of immense importance to the public, and great hazard to themselves, they should, by a forced construction, be involved in damages to an unknown amount, not contemplated when they accepted then-charter. In the 9th section of the act, (6 State Laws, 258,) authority is given to the defendants, “theiqsuperintendants, surveyors, engineers, artists, and workmen, to enter upon the said river Schuylkill, to open, enlarge, or deepen the same, in any part thereof which shall appear to them most convenient, for opening, changing, makihg anew, or improving the channel, and also to cut, break, remove, and take away all trees, rocks, stones, earth, ground, sand, or other material, or any obstruction or impediment whatever within the said river, and. to use all such timber, rocks, stones, gravel, earth, or other material in the construction of their necessary works, and to form, make, erect, and set up any dams, locks, or any other device whatsoever which they shall think most fit and convenient to make a complete slackwater navigation,” &cc. And by the 10th section, which bears most im- . mediately on the case, “ if any person or persons shall he injured by means of any dam or. dams being erected, as hereinafter mentioned, or the land of any person inundated by swelling of the water, in consequence of the erecting of any dam or dams, or any mill or other water works injured by swelling the water into any tail race of any mill or other water works, which may have been erected in said river, or any stream of water emptying into the same; and if the president, managers, and company cannot agree with the owner or owners thereof, on the compensation to be paid for such injury, the same proceedings shall be had as is directed in the 11th section of the act,” &c. The 11th section authorizes the defendants to enter upon find occupy all land which shall be necessary and suitable for erecting of any lock, sluice, or canal, and directs the manner of ascertaining the compensation for the damages, in case the parties cannot agree on it. The 13th section authorizes the defendants to enter upon any land contiguous and near to the river, and take and carry away any stone, ground, sand, or earth, making amends for any damages that may be done, and directing the manner of ascertaining the damages, if the parties cannot agree on the amount. These are the only parts of the act necessary to be taken into consideration. The expressions of the 10th section are remarkable, — “ if any person shall be injured by means of any dam being erected, as hereinafter mentioned.” One would suppose at first, that the words, as hereinafter men-tionedt referred to dams; but it appears that there is no mention afterwards of the erection of dams; the power 'to erect them having been previously given in the 9th section. So that, in strictness, the words as hereinafter mentioned have nothing to refer to, but *83 the injury done by means of the dams. The different kinds of injury arising from dams are afterwards mentioned, and if this be the true construction, all injuries to fisheries are out of the question, because no mention is made of them. I should be loth, however, to rest my opinion on this law on such a criterion. I choose rather to collect the intention of the legislature from a more enlarged view of the subject. And, first, as different kinds of injury arising from dams, are specified, it is extraordinary that fisheries should not have been mentioned, if intended to be included ; because it could not have escaped the attention of the legislature, that all lands suitable for drawing a seine, would be rendered less valuable, when fish should cease to ascend the river. The next observation that arises, is, that all the injuries mentioned in the act, are those which are done to property immediately, — such as the inundation of land, the swelling of the water into the tail races of mills or other water works, the carrying of a canal or lock through a man’s land, or the taking away of ground, earth, stone, or other material. These are palpable and direct, so that there can be no dispute about the injury, though there may, as to the quantum. This is the line, then, which seems to have been marked by the legislature. Compensation shall be made for all damage arising from immediate injury to property, but not for any damage where there is no legal injury, which is called dam-num sine injuria. And, upon reflection, we shall find that this was a wise restriction. There would be no end to damages for injuries considered in the most extensive sense of the word. For .not only may the owners of land contiguous to the river, complain of injury by the obstruction to the ascent of fish, but also all other, persons living in towns or-lands near the river. All these persons feel the loss of fish. They either cannot get them at all, or must pay a higher price for them. All persons accustomed to fish with an ángle, or a hoop net, may truly say they are injured. There are other kinds of injury too, sustained, particularly by the owners of lands on the river, between the Fairmount dam and the Lower Falls. All these persons have lost the benefit of navigation free from toll, in batteaus, flats, &c. which was very useful, as it served for carrying produce to market, and bringing up manure for their lands. Yet it has not been contended that for such injuries compensation is to be made. Suppose the health of the country to be injured by the evaporation from the dams. Is compensation to be made for this, the greatest of all injuries ? I presume not. Where, then, are we to stop, or what is to be the boundary, if we go beyond the line which I have mentioned? I confess I should be at a loss to fix any other. The plaintiff retains .the complete ownership of his land, and the exclusive right of using it for the purpose of a fishery. There will still be fish, which remain all the year in the river, though the ascent of those from the sea is stopped. The value of his land is lessened, and *84 that is bis misfortune. But it is lessened by an accidental circumstance.' No property has been taken from him. He had no property either in the fish, or the river. And he was bound to know the law, by which the river remained public property, and of course all emoluments from fisheries were precarious. Upon full consideration, it is the unanimous opinion of this court, our brother Gijjson included, who is now absent, that the plaintiff has suffered no injury intended to be compensated by the act of assembly, and therefore the judgment of the Court of Common Fleas should be affirmed.
Judgment affirmed,